UNITED STATES BANKRUPTCY COURT EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION IN RE: JOHN ADAM KOZAK, Debtor

_____

DWAYNE AYERS, et al, Plaintiffs v. JOHN ADAM KOZAK, Defendant CASE NO. 24-
04051-5-PWM Chapter 7 ADVERSARY PROCEEDING NUMBER: 25-00145-5-PWM
Amended Answer

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT EASTERN DISTRICT OF NORTH CAROLINA RALEIGH DIVISION IN RE: JOHN ADAM KOZAK, Debtor | SUPERIOR COURT DIVISION |

_____

DWAYNE AYERS, et al, Plaintiffs v. JOHN
ADAM KOZAK, Defendant CASE NO. 24-
04051-5-PWM Chapter 7 ADVERSARY
PROCEEDING NUMBER: 25-00145-5-
PWM MOTION FOR EXTENSION OF TIME

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT EASTERN DISTRICT OF NORTH CAROLINA RALEIGH DIVISION IN RE: JOHN ADAM KOZAK, Debtor | FILE NO.: 24CVS001928-090 |

_____

DWAYNE AYERS, et al, Plaintiffs v. JOHN
ADAM KOZAK, Defendant CASE NO. 24-
04051-5-PWM Chapter 7 ADVERSARY
PROCEEDING NUMBER: 25-00145-5-PWM

| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURT EASTERN DISTRICT OF NORTH CAROLINA RALEIGH DIVISION IN RE: JOHN ADAM KOZAK, Debtor | ) ) ) ) ) | **AMENDED ANSWER** |

_____

DWAYNE AYERS, et al, Plaintiffs v. JOHN    )

ADAM KOZAK, Defendant CASE NO. 24-
04051-5-PWM Chapter 7 ADVERSARY
PROCEEDING NUMBER: 25-00145-5-
ANSWER

    )
    )

The defendant John Adam Kozak amended answering the claim for relief filed by the plaintiff, do hereby allege and say:

## MOTION TO DISMISS / 12(B)(6)

The undersigned defendants hereby move the Court pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure that the Complaint filed by the plaintiff in the above-captioned case be dismissed on the ground that the Complaint fails to state a claim upon which relief can be granted.

## FIRST DEFENSE
## RESPONSE TO SPECIFIC ALLEGATIONS

Responding to the specific allegations contained in the plaintiff's claim for relief, the undersigned defendants do hereby allege and say:

1. Plaintiffs Dwayne and Karen Ayers are citizens and residents of Pinehurst, NC.
   ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

2. Plaintiffs Chris and Danielle Boukedes are citizens and residents of Cornelius, North Carolina.
   ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

3.  Plaintiffs Justin and Sarah-Margaret Church are citizens and residents of North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

4.  Plaintiffs Arrington and Courtney Driver are citizens and residents of Advance, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

5.  Plaintiff Chadwick Frye is a citizen and resident of Holly Springs, North Carolina. Plaintiff Frye Property, LLC is a limited liability company organized and existing under the laws of North Carolina and has a principal office in Lexington, NC.

ANSWER:  Admit in part and deny in part. Defendant admits Plaintiff Frye is a resident of Holly Springs, North Carolina but lacks knowledge as to the formation or principal office location of Frye Property, LLC and therefore denies the same.

6.  Plaintiffs Christopher and Lyndsey Gibson are citizens and residents of Durham, NC. Plaintiff Rhoback Properties, LLC was a limited liability company organized under the laws of North Carolina. Rhoback Properties, LLC has been administratively dissolved.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

7.  Plaintiffs Jessica and David Gordon are citizens and residents of Eagle Mountain, UT. Plaintiff Sunkissed NC, LLC is a limited liability company organized and existing

under the laws of North Carolina and has a principal office in Raleigh, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

8. Plaintiff Mason Gosse is a citizen and resident of Charlotte, North Carolina. Plaintiff Marshall Lane Design & Interior LLC is a limited liability company organized and existing under the laws of North Carolina with a principal office in Charlotte, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

9. Plaintiff Joyce Hamilton is a citizen and resident of Denver, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

10. Plaintiff Brian Hardwick is a citizen and resident of Wake Forest, NC. Plaintiff Hardwick NC Properties, LLC is a limited liability company organized and existing under the laws of North Carolina with a principal office in Wake Forest, North Carolina. Plaintiff SPF6O3 LLC is a limited liability company organized and existing under the laws of North Carolina with a principal office in Wake Forest, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

11. Plaintiffs Dennis and Erin Hicks are citizens and residents of Lanoka Harbor, New Jersey.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

12. Plaintiffs John and Nikki Huebner are citizens and residents of Raleigh, North Carolina. Plaintiff Huebner Realty Pros LLC is a limited liability company organized and existing under the laws of North Carolina with a principal office in Raleigh, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

13. Plaintiff Benjamin Koberna ("Koberna") is a citizen and resident of Kent, Ohio.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

14. Plaintiffs Joseph and Christine Longo are citizens and residents of Sunset Beach, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

15. Plaintiffs Sonya and David Mason are citizens and residents of Fort Mill, South Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

16. Plaintiffs Matthew and Kimberly McKinney are citizens and residents of Charlotte, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

17. Plaintiffs Lori and Barry Pry are citizens and residents of Pinehurst, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

18. Plaintiff Cari Rabinowitz is a citizen and resident of Charlotte, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

19. Plaintiffs Sarah and Andre Ranadive are citizens and residents of Pinehurst, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

20. Plaintiffs Justin and Tonya Sciranko are citizens and residents of Concord, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

21. Plaintiffs Jeff and Debbie Vandeven are citizens and residents of Kansas City, Missouri.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

---

22. Plaintiffs Mattie and Robert Walker are citizens and residents of Waxhaw, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

---

23. Plaintiffs Darnell (III) and Melissa Williams are citizens and residents of Elon, North Carolina. Plaintiff At Last 3, LLC is a limited liability company organized and existing under the laws of North Carolina and has a principal office located in Burlington, North Carolina.

ANSWER:  Defendant lacks sufficient knowledge or information to admit or deny this allegation and therefore denies the same.

---

24. Upon information and belief, John Adam Kozak ("Defendant" or "Kozak") is a citizen and resident of Apex, Wake County, North Carolina, and is not an infant, incompetent person nor in active military service or otherwise subject to the protections afforded under the Servicemember Civil Relief Act.

ANSWER:  Deny. Defendant resides in Holly Springs, North Carolina, not Apex. Defendant admits he is not an infant, incompetent person, or in active military service, and is not subject to the protections of the Servicemember Civil Relief Act.

25

Stellar Beach Realty and Rentals, LLC ("Stellar Beach") is a limited liability company organized and existing under the laws of North Carolina and has a principal office located

in Brunswick County, North Carolina.

ANSWER:  Admit in part and deny in part. Admit that Stellar Beach Realty and Rentals, LLC was organized under North Carolina law. Deny that Defendant had fiduciary duties as Broker or Broker-in-Charge. Contracts were to be updated and maintained by the BIC or Qualifying Broker, and the North Carolina Real Estate Commission reviewed the latest versions for compliance per the BIC's confirmation.

26

On November 20, 2024 (the "Petition Date"), the Defendant filed with this Court his voluntary petition for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Case").

ANSWER:

Admit. Defendant filed a voluntary petition under Chapter 7 on that date. Defendant notes that the filing was made as an emergency filing due to events surrounding the sudden loss of business operations

27

This Court has jurisdiction and venue over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 1409(a).

AP Complaint All Counts

ANSWER:

Admit.

28

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

AP Complaint All Counts

**ANSWER:**

Admit.

---

29

Defendant formed Stellar Beach in August of 2016.

AP Complaint All Counts

**ANSWER:**

Admit. Stellar Beach was formed in 2016 as a North Carolina limited liability company engaged in property management operations.

---

30

Stellar Beach was in the business of managing vacation home rentals in Holden Beach, Ocean Isle Beach, and Sunset Beach, North Carolina.

AP Complaint All Counts

**ANSWER:**

Admit. Stellar Beach operated in the stated coastal regions providing vacation rental management services through licensed Brokers under Real Estate Commission oversight.

---

31

From the time of its formation through the Petition Date, Defendant was the sole owner, member and manager of Stellar Beach.

AP Complaint All Counts

**ANSWER:**

Admit in part and deny in part. Defendant admits ownership but denies having fiduciary

responsibilities as manager or broker. All management and fiduciary duties were performed by licensed Brokers, including the Broker-in-Charge (BIC) or Qualifying Broker.

---

32

According to Defendant's testimony under oath at his Section 341 Meeting of Creditors on February 3, 2025, Defendant made the major financial and business decisions for Stellar Beach.

AP Complaint All Counts

ANSWER:

Admit in part and deny in part. Defendant acknowledges making certain business decisions as owner but denies making operational or fiduciary decisions governed by licensed Brokers.

---

33

At all times relevant to this action, Defendant had access to, control and management over Stellar Beach's bank accounts maintained at Truist Bank, including Stellar Beach's operating account bearing Truist Account No. xxxx0445 (the "Operating Account") and a trust or escrow account maintained at Truist Bank bearing Truist Account No. xxxx3013 (the "Escrow Account").

AP Complaint All Counts

ANSWER:

Admit in part and deny in part. The listed accounts were maintained at Truist Bank. Those accounts were under the authority of the BIC and accounting personnel per Real Estate Commission requirements.

---

34

As the property manager of a vacation home for a homeowner, Stellar Beach would, among other things, market, solicit and advertise the vacation homes to prospective vacation rental renters; enter into vacation rental agreements with prospective renters; collect advanced payments, rents, occupancy taxes, cleaning fees and other fees from renters; remit those funds to the appropriate taxing authority; arrange for repairs needed for any given vacation home; facilitate the cleaning of the property between bookings; deliver accountings of the vacation home to the homeowner; and collect and remit rental proceeds to the homeowner on the 15th of the month following a check-out date of a vacation rental, less appropriate deductions authorized by the property management agreement with the homeowner.

AP Complaint All Counts

**ANSWER:**

Admit. Stellar Beach performed property management and rental duties through staff and Brokers as described. Defendant clarifies he did not personally perform or supervise the operational steps described; these were the responsibilities of licensed Brokers under Commission authority.

---

35

To induce Plaintiffs to enter into the Agreements, Defendant represented to Plaintiffs that Stellar Beach would, among other things, market, solicit and advertise the Vacation Homes to prospective vacation rental renters; enter into vacation rental agreements with prospective renters; collect advanced payments, rents, occupancy taxes, cleaning fees and other fees from renters; remit those funds to the appropriate taxing authority; arrange for repairs needed for any given vacation home; facilitate the cleaning of the property between bookings; deliver accountings of the vacation home to the homeowner; and collect and remit rental proceeds to the homeowner on the 15th of the month following a check-out

date of a vacation rental, less appropriate deductions authorized by the property management agreement with the homeowner.

AP Complaint All Counts

ANSWER:

Deny in part. Defendant denies personally making inducements or representations to Plaintiffs as alleged. Any representations regarding operations or procedures were made through Stellar Beach's licensed Brokers and administrative staff. Defendant's role was limited to ownership and business oversight without fiduciary responsibility.

36

In reliance upon these representations made to Plaintiffs by Defendant, between 2021 and 2024, Plaintiffs each entered into separate Exclusive Property Management Agreements (the "Agreements" and individually, an "Agreement") with Stellar Beach allowing Stellar Beach to rent and manage the Vacation Homes on Plaintiffs' behalf.

ANSWER:

Admit in part and deny in part. Defendant admits Plaintiffs entered into management agreements with Stellar Beach. Denies that the agreements were made in reliance upon personal representations by Defendant. All agreements were handled, maintained, and executed by the company's licensed Broker-in-Charge (BIC) or Qualifying Broker in accordance with North Carolina Real Estate Commission rules.

37

In exchange for providing the property management services described above, Stellar Beach was entitled to charge the Plaintiffs a management fee and other charges as described in the Agreements (the "Management Fees").

ANSWER:

Admit in part and deny in part. Defendant admits Stellar Beach charged management fees and other authorized charges as described in the Agreements. Denies that Defendant personally imposed, controlled, or received such fees. All financial terms and management fee structures were approved and maintained by the Broker-in-Charge (BIC) or Qualifying

Broker under North Carolina Real Estate Commission oversight.

38

At no time during the dealings between any of the Plaintiffs and Stellar Beach did a property management fee due to Stellar Beach under the Agreements exceed twenty percent (20%) of the Rental.

ANSWER:

Admit in part and deny in part. Defendant admits Stellar Beach charged fees consistent with contractual limits. Denies any personal control or receipt of those funds. All accounting and fee practices were conducted under the supervision of the Broker-in-Charge (BIC) or Qualifying Broker pursuant to North Carolina Real Estate Commission rules.

---

39

Some of the Agreements provided that the property management fee due to Stellar Beach was earned at the time of the vacation rental agreement being signed (i.e. the booking) while other Agreements stated the property management fee was not earned nor due to Stellar Beach until the vacation renter checked into the Vacation Home.

ANSWER:

Admit in part and deny in part. Defendant admits there were variations in the timing of when management fees were considered earned. Denies any implication that Defendant personally managed or determined the fee structure. The contracts were to be updated to match the latest standardized versions and maintained by the BIC or Qualifying Broker, who was responsible for oversight and compliance. Defendant was not a Broker or BIC and therefore did not have fiduciary duties. Furthermore, the Commission was in direct contact with the company and, per the BIC, reviewed the latest contract versions to ensure compliance. According to the BIC, everything was correct.

---

40

For example, the Agreement between Stellar Beach and Plaintiffs Arrington and Courtney Driver provided in paragraph 4 that the management fee was earned when the renter books a vacation stay as follows:

*A true and correct copy of the Agreement between Stellar Beach and Plaintiffs Arrington and Courtney Driver is attached hereto as Exhibit A and incorporated herein by reference.*

ANSWER:

Admit in part and deny in part. Same response as  39. Defendant was not a Broker or BIC and had no fiduciary duties. All contracts were maintained and verified by the BIC or Qualifying Broker to ensure compliance with current North Carolina Real Estate Commission standards.

41

Conversely, the Agreement between Stellar Beach and Plaintiff Dwayne and Karen Ayers provided in paragraph 4 that the management fee was earned when the renter checks in as follows:

*A true and correct copy of the Agreement between Stellar Beach and Plaintiffs Dwayne and Karen Ayers is attached hereto as Exhibit B and incorporated herein by reference.*

ANSWER:

Admit in part and deny in part. Same as  39. Defendant did not determine when fees were earned or due. Contracts were standardized and controlled by the BIC or Qualifying Broker under Real Estate Commission review.

42

As the property manager of the Vacation Homes under the Agreements, Stellar Beach served as the exclusive agent and representative of Plaintiffs for the Rentals.

**ANSWER:**

Admit in part and deny in part. Stellar Beach acted as property manager pursuant to written agreements. Defendant denies that this created personal fiduciary obligations to Plaintiffs, as those responsibilities belonged to the BIC or Qualifying Broker, who supervised all trust and escrow functions.

---

43

As the exclusive agent and representative of Plaintiffs under the Agreements, Stellar Beach and the Defendant, as the president and sole owner and manager of Stellar Beach, had and owed a fiduciary duty and obligation to the Plaintiffs for the Rentals and all monies collected on their behalf from the Rentals.

**ANSWER:**

Deny. Defendant was not a licensed Broker or Broker-in-Charge and therefore had no fiduciary duties. Fiduciary responsibilities under North Carolina law rested solely with the BIC or Qualifying Broker.

---

44

Plaintiffs and Defendant understood the relationship to be fiduciary in nature; that Defendant owed the duties of a fiduciary to the Plaintiffs and at all relevant times was acting as a fiduciary to each respective Plaintiff.

**ANSWER:**

Deny. Defendant did not owe fiduciary duties to Plaintiffs. Any such duties were held exclusively by the BIC or Qualifying Broker under NCREC regulation.

---

45

Pursuant to Paragraph 9 of the Agreements, Stellar Beach collected and received all vacation advance payments, security deposits, rental payments and fees from renters under the vacation rental agreements, including advanced payments that were to be held in trust on behalf of the Plaintiffs pursuant to the North Carolina Vacation Rental Act.

ANSWER:

Admit in part and deny in part. Defendant admits Stellar Beach collected advance payments and security deposits per the NCVRA. Denies any personal control or handling of escrow accounts, which were managed by the BIC and accounting staff under Commission rules.

---

46

At the time of the initial booking, renters who signed vacation rental agreements to stay in the Vacation Homes were required to, and in fact did, pay to Stellar Beach, as agent for the Plaintiffs, fifty percent (50%) of the total contracted rental amount for any given Vacation Home (the "Advance Payments").

ANSWER:

Admit. Renters typically paid 50% upon booking. Defendant adds that exceptions occasionally occurred where smaller or full payments were accepted depending on timing or renter preference.

---

47

All Advance Payments or portions thereof that was not earned by Stellar Beach under the express terms of the Agreements belonged to the Plaintiffs and were to be held in the Escrow Account until disbursed by Stellar Beach to the Plaintiffs on the fifteenth (15th) day of the month following the completion of the renters' stay in the Vacation Homes.

ANSWER:

Admit in part and deny in part. Defendant admits this represents standard practice under the Agreements. Denies personal control or direction over escrow accounts, which were managed by the BIC and accounting personnel under the Commission's trust account requirements.

---

48

The Advance Payments were paid by the vacation renters to Stellar Beach and deposited into the Escrow Account.

ANSWER:

Admit. Funds were deposited into escrow accounts as required. Defendant denies having individual access to these funds without permission from BIC and accounting staff; escrow management and reconciliation were conducted by the BIC and accounting staff.

49.

The remaining fifty percent (50%) due under the vacation rental agreements was due at the time of and before the renters checked into the Vacation Homes, and the renters of each of the Vacation Homes, at all relevant times, in fact did pay to Stellar Beach, as agent for the Plaintiffs, the remaining fifty percent (50%) (the "Final Payment" or "Final Payments") prior to occupying the Vacation Homes.

ANSWER:

Admit in part and deny in part. Defendant admits that renters were required to and did pay the remaining fifty percent (50%) prior to occupying the Vacation Homes. Defendant denies any implication that he personally controlled the collection or handling of these funds. All such payments were processed and recorded by Stellar Beach's accounting personnel and the Broker-in-Charge (BIC) or Qualifying Broker in accordance with North

Carolina Real Estate Commission rules.

---

50.

None of the renters were allowed to occupy the Vacation Homes until the Final Payments were received by Stellar Beach.

ANSWER:

Admit in part and deny in part. Defendant admits that Stellar Beach's policy was not to allow renters to occupy the Vacation Homes until Final Payments were received. Defendant denies any suggestion that he personally enforced or controlled this process; day-to-day enforcement and confirmation of payments were handled by staff and the BIC/Qualifying Broker.

---

51.

Similar to the Advance Payments, the Final Payments paid by renters under the Agreements were deposited in the Escrow Account where they were to be held and remain until

the funds were disbursed to the Plaintiffs on the fifteen day of the month following the renters'

stay in the Vacation Homes.

ANSWER:

Admit in part and deny in part. Defendant admits that Final Payments were to be deposited into the escrow account and held for the benefit of Plaintiffs until disbursed under the Agreements.   Minus all accumulated expenses.  Defendant denies  any wrong doing,

---

52.

Depending on the language of each Agreement, Stellar Beach earned its

management fee, and had the authority to withdraw the amount equal to the earned management

fee from the Escrow Account upon the happening of the condition stated in each

Agreement;

either when the booking was made or when the renter checked in.

ANSWER:

Admit and deny in part. Defendant admits that, depending on the specific contract

language, Stellar Beach earned and could withdraw its management fee when the booking

occurred or when the renter checked in. Defendant denies any  wrong doing and denies

personally directing or controlling withdrawals from escrow. Such withdrawals, if made,

were handled through company procedures by the BIC and accounting department.

Defendant denies  any wrong doing,

---

53.

At all times, the funds in the Escrow Account that represented Advance

Payments, less earned management fees, and Final Payments belonged to and were property of

Plaintiffs.

ANSWER:

Admit in part and deny in part. Defendant admits that, under the Agreements and

applicable law, escrowed Advance Payments (less earned fees) and Final Payments were

held for the benefit of Plaintiffs. Defendant denies any implication that he personally

misused, diverted, or mishandled those funds. Escrow responsibilities and fiduciary duties

belonged to the BIC and Qualifying Broker. Defendant denies  any wrong doing,

---

54.

At no time did any of the Final Payments belong to Stellar Beach or Defendant.

ANSWER:

Admit in part and deny in part. Defendant admits that Final Payments were homeowner funds and did not belong personally to Defendant. Defendant denies any allegation that he treated such funds as his own or misappropriated them. Any handling and allocation of those funds was done by Stellar Beach's escrow and accounting systems under broker supervision, not by Defendant in an individual capacity. Defendant denies  any wrong doing,

---

55.

According to the August Escrow Statement, $412,914.94 was deposited into the Escrow Account in August 2024.

ANSWER:

Admit in part and deny in part. Defendant admits that funds were deposited into the escrow account in August 2024 but denies the exact amount for lack of access to verify the statement. Defendant states that escrow deposits and reconciliations were handled by the BIC and accounting personnel; Defendant did not personally maintain or reconcile the escrow ledger. Defendant denies  any wrong doing,

56.

Upon information and belief, of the $412,914.94 in deposits, Stellar Beach collected $408,640.45 from collection of rents for vacation stays and from Advance Payments for bookings made in August 2024.

ANSWER:

Admit in part and deny in part. Defendant admits that deposits were collected by Stellar Beach during August 2024 but denies the exact amount for lack of access to records. All escrow activity was conducted by the accounting department and supervised by the Broker-in-Charge (BIC). Defendant had no direct authority over escrow accounts.

Defendant denies  any wrong doing,

---

57.

On or about September 16, 2024, Plaintiffs expected to receive their Rental Proceeds from rentals that occurred during the month of August 2024 (the "August Rental Proceeds") from Stellar Beach in accordance with the Agreement.

ANSWER:

Admit in part and deny in part. Defendant admits that homeowners expected proceeds in September for August rentals. Denies personal control or involvement in distribution timing. Disbursements were made or delayed under the BIC's supervision and based on reconciliations conducted by accounting personnel. Defendant denies  any wrong doing,

---

58.

To their dismay and surprise, Plaintiffs did not receive August Rental Proceeds as they had been accustomed to receiving.

ANSWER:

Admit in part and deny in part. Defendant admits some homeowners did not receive proceeds as expected, but others did. The company experienced reconciliation delays due to accounting review under Real Estate Commission oversight. Defendant had no fiduciary role or control over escrow disbursement timing. Defendant denies  any wrong doing,

---

59.

Upon information and belief, unbeknownst to Plaintiffs, throughout 2024 Defendant had routinely transferred or caused funds that represented Advance Payments and/or Final Payments to be transferred from the Escrow Account into the Operating Account and then transferred or caused those funds to be transferred out of the Operating Account to himself

or to entities wholly or partially owned and/or controlled by Defendant (the "Unauthorized Transfers").

ANSWER: Admit in part and deny in part. Defendant admits transfers occurred between the Escrow and Operating Accounts; however, denies that such transfers were unauthorized or for personal benefit. All transfers would have a memo showing the nature and purpose of the transaction. Defendant denies any  wrong doing.

---

60.

For instance, on or about March 11, 2024, Defendant transferred $207,981.65 from the Escrow Account into the Operating Account. Then, on or about March 12, 2024, Defendant transferred the same amount, $207,981.55, from the Operating Account to himself or an entity owned or controlled by him.

ANSWER:

Deny any wrong doing,

61.

Other instances of transfers by Defendant from the Escrow Account to the Operating Account followed by transfers from the Operating Account to Defendant or entities owned or controlled by the Defendant include:

ANSWER:

Deny any wrong doing,

62.

The transfers from the Escrow Account to the Operating Account referenced in Paragraph 62 and its subparts above, among others, were recorded and tracked in the Escrow Account ledger maintained by Stellar Beach (the "Escrow Ledger"). A true and correct

copy of the Escrow Ledger for the time period of January 2, 2024 through November 21, 2024 is attached as Exhibit C and incorporated herein by reference.

ANSWER:

Deny any wrong doing,

63.

The transfers from the Escrow Account to the Operating Account referenced in Paragraph 62 and its subparts above, among others, were recorded and tracked in the Escrow Account ledger maintained by Stellar Beach (the "Escrow Ledger"). A true and correct copy of the Escrow Ledger for the time period of January 2, 2024 through November 21, 2024 is attached as Exhibit C and incorporated herein by reference.

ANSWER:

Deny any wrong doing,

64.

The transfers from the Escrow Account to the Operating Account and transfers from the Operating Account to or for the benefit of Defendant referenced in Paragraph 62 and its subparts above, among others, were recorded and tracked in the Operating Account ledger maintained by Stellar Beach (the "Operating Ledger"). A true and correct copy of the Operating Ledger for the time period of January 2, 2024 through October 25, 2024 is attached as Exhibit E and incorporated herein by reference.

ANSWER:

Deny any wrong doing,

65.

The transfers from the Escrow Account to the Operating Account and transfers

from the Operating Account to or for the benefit of Defendant referenced in Paragraph 62 and its

subparts above, among others, are reflected in the Operating Account bank statements for the

respective periods. True and correct copies of the Operating Account bank statements are attached at Exhibit F and incorporated by reference.

ANSWER:

Deny any wrong doing,

66.

Upon information and belief, between February 16, 2024 and August 14, 2024,

Defendant transferred $1,951,857.86 from the Escrow Account into the Operating Account and

then transferred those funds to himself or to entities he owned or controlled.

ANSWER:

Deny any wrong doing,

67.

Upon information and belief, Stellar Beach's bookkeeper, Ramon Van Dyjk

("Van Dyjk") did not cause or assist with the Unauthorized Transfers.

ANSWER:

Admit in part and deny in part. Defendant admits that the bookkeeper followed the

instructions and procedures in the accounting system and did not initiate transfers on his own. Defendant denies the characterization of any transfers as "Unauthorized Transfers" and denies that any improper or unauthorized transfers were made. Defendant denies  any wrong doing,

---

68.

Upon information belief, Van Dyjk would not learn of the Unauthorized Transfers

until after the transfers had been made and completed and the Unauthorized Transfers showed in

the bank account records.

ANSWER:

Neither admit nor deny for lack of sufficient knowledge or information to form a belief as to the truth of the allegations. To the extent a response is required, Defendant denies that the transfers were "unauthorized" and reiterates that all financial activity was recorded in the normal course of business by accounting staff and reviewed by the BIC. Defendant denies  any wrong doing,

---

69.

Upon information and belief, Van Dyjk regularly advised Defendant against

making the Unauthorized Transfers, specifically advising Defendant that the Unauthorized Transfers were erroneous and that he should not be making the Unauthorized Transfers.

ANSWER:

Deny any wrong doing,

---

70.

Upon information and belief, in response to the advice against making these

Unauthorized Transfers, Defendant acknowledged the Unauthorized Transfers and assured Van

Dyjk he would cover the Unauthorized Transfers.

**ANSWER:**

Deny any wrong doing,

---

71.

Upon information and belief, Van Dyjk recorded the Unauthorized Transfers in a

financial register labeled "N∕R Register John Kozak" (the "Unauthorized Transfer Register")

within QuickBooks, the bookkeeping software used by Stellar Beach in the ordinary course of

Stellar Beach's business. A true and correct copy of the Unauthorized Transfer Register showing

Unauthorized Transfers from February 16, 2024 through October 16, 2024 is attached as Exhibit

G and incorporated herein by reference.

**ANSWER:**

Admit in part and deny in part. Defendant admits that QuickBooks and internal financial

registers were used by Stellar Beach, including registers referencing his name, and that

entries were recorded in the ordinary course of business. Defendant denies the label

"Unauthorized Transfer Register" and denies that any transfers recorded there were

unauthorized or for his personal benefit. Defendant denies  any wrong doing,

---

72.

The Unauthorized Transfers were done without the knowledge, consent and

authorization of Plaintiffs.

ANSWER:

Deny. Defendant denies that there were "Unauthorized Transfers" as alleged and denies that any transfers occurred without proper authority. All company financial activity was conducted by Stellar Beach personnel in the regular course of business. Any question of "knowledge, consent, and authorization" relates to broker and accounting compliance, not to Defendant personally. Defendant denies  any wrong doing,

---

73.

Instead, upon information and belief, funds from the Unauthorized Transfers were used by Defendant for his personal use or by entities wholly or partially owned and/or controlled
by Defendant for other business endeavors.

ANSWER:

Deny. Defendant denies using any funds from the Escrow Account or Operating Account for his personal use or for entities he owned or controlled. Defendant removed the earlier language suggesting how all funds were used; he maintains simply that he did not personally receive, direct, or benefit from the funds alleged in this paragraph. Defendant denies  any wrong doing,

---

74.

Upon information and belief, Defendant was solely responsible for the Unauthorized Transfers.

ANSWER:

Deny. Defendant denies being responsible, solely or otherwise, for any so-called Unauthorized Transfers. All transfers between accounts were handled by Stellar Beach's accounting staff and under the supervision of the BIC or Qualifying Broker. Defendant was

not a Broker or BIC and did not have fiduciary duties over trust or escrow accounts. Defendant denies any wrong doing,

---

**75.**

The Unauthorized Transfers done by Defendant caused a major shortfall in the Escrow Account (the "Escrow Account Shortfall"), preventing Stellar Beach from having enough money to make distributions to Plaintiffs for the Rentals in August as required under the

Agreements.

**ANSWER:**

Admit in part and deny in part. Defendant admits that there was an escrow shortfall that impacted distributions to some Plaintiffs. Defendant denies that he caused the shortfall, denies that any transfers were unauthorized, and denies any personal wrong doing. The shortfall arose in the context of Stellar Beach's overall business operations, reconciliations, and timing of payments, which were handled by brokers and accounting staff. Defendant denies any wrong doing,

---

**76.**

As a result of the Escrow Account shortfall, Plaintiffs Dwayne and Karen P. Ayers, Chris and Danielle Boukedes/Lone Palm LLC, Justin and Sarah-Margaret Church, Arrington and Courtney Driver, Chadwick Frye/Frye Property, LLC, Lyndsey and Christopher

Gibson/Rhoback Properties, LLC, Jessica and David Gordon/Sunkissed NC, LLC, Mason Gosse/Marshall Lane Design & Interior LLC, Joyce Hamilton, Brian Hardwick/Hardwick NC

Properties, LLC/Spf603 LLC, Dennis and Erin Hicks, Benjamin Koberna, Joseph and Christine

Longo, Sonya and David Mason, Matthew and Kimberly McKinney, Lori and Barry Pry,

Sarah

and Andre Ranadive, Justin and Tonya Sciranko, Jeff and Debbie Vandeven, Mattie and Robert

Walker and Darnell (III) and Melissa Williams/At Last 3, LLC did not receive the August Rental

Proceeds owed to them in September of 2024 for stays in the Vacation Homes that took place in

August of 2024.

**ANSWER:**

Admit in part and deny in part. Defendant admits that **some of the Plaintiffs** did not receive August Rental Proceeds when expected. Defendant denies that no one received payments; some homeowners did receive payments. Defendant further denies that any alleged shortfall or delay was the result of  wrong doing by him personally. Defendant denies  any wrong doing,

---

77.

As a result of the Escrow Account Shortfall, no Plaintiffs received Rental

Proceeds that were collected by Stellar Beach and owed to them in October for stays that took

place in September of 2024, or Rental Proceeds owed to them in November for stays that took

place in October of 2024.

**ANSWER:**

Admit in part and deny in part. Defendant admits that Plaintiffs did not receive certain Rental Proceeds for stays in September and October 2024. Defendant denies any  wrong doing and denies that this resulted from intentional or improper acts by him personally. The situation arose during the company's operational and financial difficulties, not from any fraudulent or malicious conduct by Defendant. Defendant denies  any wrong doing,

78.

On September 17, 2024 at 7:41 pm, Defendant sent an email to Van Dyjk asking

him to run a report in Authorize.net or another program to determine the amount Stellar
Beach

had taken in for October and the amount that needed to be in the Escrow Account.

ANSWER:

Admit. Defendant admits sending the email. The purpose of the request was to verify how

much had been taken in and how much ought to be present in escrow, to reconcile

accounts and ensure accuracy of funds held. Defendant denies  any wrong doing,

79.

On September 18, 2024 at 8:28 am, Van Dyjk responded by email that he would

run a reservation report for October.

ANSWER:

Admit.

80.

On September 18, 2024 at 9:45 am, Defendant replied to Van Dyjk by email as
follows:

"Ok can you do that? But I need all from Oct on not just Oct. I need to see how much

has been taken in they (sic) needs to be in Trust.
Thank you"

ANSWER:

Admit. Defendant admits sending this reply and states that the purpose of the email was to

confirm how much had been taken in and what amounts needed to be held in trust,

consistent with efforts to reconcile the escrow account and ensure the correct balances were in place. Defendant denies  any wrong doing,

81.

Upon information and belief, Defendant was requesting information on all Advance Payments that Stellar Beach had accepted for future rentals in order to determine how much Defendant had misappropriated and needed to be replaced.

ANSWER:

Deny. Defendant denies that his inquiry sought to determine any "misappropriated" funds. Defendant requested the information to reconcile balances and confirm the total Advance Payments received for future rentals, consistent with efforts to ensure accurate accounting and determine company obligations to homeowners and renters. Defendant denies  any wrong doing,

82.

On September 18, 2024 at 10:41 am, Van Dyjk emailed Defendant with the requested information and noted that "based on the assumptions above, the Escrow account should have currently $969,018 in the account."

ANSWER:

Admit in part and deny in part. Defendant admits receiving the referenced email. Defendant denies any suggestion that the information reflected misappropriation or  wrong doing. The correspondence related to reconciliation of accounts and projections based on data provided by accounting staff. Defendant denies  any wrong doing,

83.

Upon information and belief, Van Dyjk produced an excel sheet titled "Streamline - future_reservations 09.18.24.xlsx" (the "Future Reservations Spreadsheet") showing future bookings for which Defendant had received deposits up to and including September 19,

2024 and attached it to his September 18, 2024th email at 10:41 am to Defendant. A true and accurate copy of the Future Reservations Spreadsheet is attached hereto as Exhibit H and incorporated herein by reference.

ANSWER:

Admit. Defendant admits receiving the Future Reservations Spreadsheet and that it contained information about future bookings and deposits. Defendant denies any  wrong doing in connection with receiving or reviewing this report. Defendant denies  any wrong doing,

---

84.

On September 18, 2024 at 10:44 am, Defendant emailed Van Dyjk inquiring about whether the $969,018.00 Van Dyjk reported earlier that morning included the payouts owed to the Homeowners for September in order to determine how much he would need to get from a sale of Stellar Beach to cover the Escrow Account Shortfall and the amount owed to the Homeowners:

Ok, is it 969,018 plus the Sept Payouts?

I'm trying to get the Payouts, plus what we should be in Escrow for Future. If I was to sell the company and cover everything.

Thank you.

ANSWER:

Admit in part and deny in part. Defendant admits sending this email and making the inquiry to determine full payout obligations. Defendant denies any admission of  wrong doing; the inquiry was part of an effort to reconcile accounts and consider a legitimate sale of the company to stabilize finances and meet obligations to homeowners. Defendant denies  any wrong doing,

---

85.

On September 18, 2024 at 10:51 am, Van Dyjk replied to Defendant communicating that the $969,081.00 would be the amount needed to cover the Advanced Payments for Rentals going forward but would not include or cover the current payouts due to the Plaintiffs and other homeowners.

ANSWER:

Admit. Defendant admits that this communication occurred and that it reflected accounting estimates. Defendant denies any implication of personal liability or  wrong doing; the purpose of the discussion was to clarify how much capital was needed to reconcile accounts and continue operations. Defendant denies  any wrong doing,

---

86.

A true and correct copy of the email exchange between Defendant and Van Dyjk from September 17, 2024 at 7:41 pm through September 18, 2024 at 10:51 am (the "Van Dyjk Emails") is attached hereto as Exhibit I and incorporated herein by reference.

ANSWER:

Admit. Defendant admits that the referenced email exchange occurred and that the exhibit appears to be a copy of that communication. Defendant denies  any wrong doing,

---

87.

On September 18, 2024 at 11:14 am, Van Dyjk emailed Defendant and provided him with a breakdown of the amount needed to satisfy the liabilities associated with the August payments to Homeowners, the August occupancy taxes, and the Escrow Account Shortfall (the "Van Dyjk Total Liabilities Email").

ANSWER:

Admit in part and deny in part. Defendant admits that the referenced email contained an accounting breakdown of amounts needed to reconcile liabilities. Defendant denies any implication that the figures reflected  wrong doing or misappropriation. The information was

part of an internal accounting review. Defendant denies  any wrong doing,

---

88.

A true and correct copy of the Van Dyke Total Liabilities Email is attached hereto as Exhibit J and incorporated herein by reference.

ANSWER:

Admit. Defendant admits that Exhibit J appears to be a true and correct copy of the referenced email. Defendant denies  any wrong doing,

---

89.

On or around September 19, 2024, Defendant solicited buyers for Stellar Beach in order to cover the Escrow Account Shortfall and infuse cash needed in the Operating Account to continue operations.

ANSWER:

Admit in part and deny in part. Defendant admits exploring a potential sale of Stellar Beach. Defendant denies that the effort was to "cover"  wrong doing; rather, it was to bring in capital to balance escrow, reconcile homeowner payments, and maintain operations. Defendant notes that buyers approached at the beginning of summer specifically indicated interest in purchasing after the rental season once reconciliations were complete. Defendant denies  any wrong doing,

---

90.

Among those solicited, Homeowner Koberna was approached to possibly buy Stellar Beach. Upon information and belief, following a telephone conversation, Defendant sent an email (the "Koberna Email") to Koberna stating:

Ben, thank you for taking the time today to talk. Let's try and get something done asap. I

really think this is a great addition to the Oasis portfolio . . . . Per our discussions Below find the numbers you requested[:]

· August Home Owner Payments: $855,228.82

· August Occupancy Taxes: $144,620.85

· Deposits to be Held in Escrow: $969,018.00

o Total Funds Required: $1,968,867.67 . . .

I have attached detailed breakdown with the Escrow Fund Projections. . . .

A true and accurate copy of the Koberna Email is attached hereto as Exhibit K and incorporated herein by reference.

ANSWER:

Admit in part and deny in part. Defendant admits that discussions occurred with Homeowner Ben Koberna regarding a potential sale of Stellar Beach. The conversation began with Bo and Wanda Tate, who was acting as Broker-in-Charge (BIC), and later included Koberna. Defendant denies any  wrong doing or intent to defraud. The communications reflected legitimate efforts to explore a sale for capital infusion. Defendant denies  any wrong doing,

---

91.

Attached to the Koberna Email was the Future Reservations Spreadsheet produced by Van Dyjk the day before at Defendant's request showing future bookings for which Defendant had received deposits by September 19, 2024.

ANSWER:

Admit in part and deny in part. Defendant admits the spreadsheet was attached and reflected future bookings. Defendant denies that it demonstrated any misappropriation. Conversations about a possible sale began with Bo and Wanda Tate (acting BIC) and were shared with potential investors including Koberna. Upon information and belief, Koberna later misused information from that spreadsheet to undermine and take over the company through third parties and former employees. Defendant denies all  wrong doing.

92.

The amount Defendant was seeking from Koberna for the purchase of Stellar Beach in the Koberna Email is consistent with the information provided by Van Dyjk in the Van Dyjk Total Liabilities Email representing amounts due to Homeowners for stays that took place in August that Stellar Beach had no cash to remit ($855,228.82), expected occupancy taxes accrued by completed stays that Stellar Beach had no cash to remit ($144,620.85), and the Escrow Account Shortfall ($969,018.00) representing Advanced Payments made as of September 19, 2024.

ANSWER:

Admit in part and deny in part. Defendant admits that the figures discussed in communications were consistent with internal accounting estimates but denies any admission of  wrong doing or "no cash to remit." The discussion reflected ongoing reconciliation and valuation in anticipation of a potential sale and recapitalization. Defendant denies  any wrong doing,

93.

Upon information and belief, those amounts had been removed from the Operating Account and the Escrow Account by Defendant and diverted by Defendant to enrich himself and fund other business endeavors.

ANSWER:

Deny. Defendant denies that any funds were removed or diverted for his personal use. Defendant denies  any wrong doing,

94.

Upon information and belief, Defendant sought the amount from Koberna for the purchase of Stellar Beach to make the Escrow Account and Operating Account whole and avoid the

consequences of his actions.

ANSWER:

Deny. Defendant denies seeking a sale to "avoid consequences." Defendant pursued the sale to secure capital and ensure all homeowner and renter accounts could be balanced. The effort was part of a legitimate business transaction and not an attempt to conceal or rectify  wrong doing. Defendant denies  any wrong doing,

---

95.

In October 2024, the North Carolina Real Estate Commission (the "NCREC") suspended Stellar Beach's license.

ANSWER:

Deny. Defendant denies that the NCREC suspended the license. The license was voluntarily turned in without Defendant's knowledge or permission by individuals including Shae Herman and Keith Hadding. The disciplinary report for October (published November) confirms no suspension. Up to that event, Stellar Beach had no complaints and operated properly under BIC Wanda Tate's supervision. Defendant denies  any wrong doing,

---

96.

Upon information and belief, NCREC suspended Stellar Beach's license due to its investigation related to the Escrow Account Shortfall and because Stellar Beach did not employ a licensed real estate broker (i.e. a broker-in-charge).

ANSWER:

Deny. Defendant denies that the license was suspended for these reasons. Upon information and belief, the BIC and Qualifying Broker were in communication with the Commission about software and audit compliance. Wanda Tate, acting BIC, indicated the operation was fine but needed updated management software, which was installed June 1,

2024. Wanda was later suspended separately for unrelated matters. Defendant denies any wrong doing,

---

97.

Upon information and belief, Stellar Beach ceased operations in and around October 2024.

ANSWER:

Admit in part and deny in part. Defendant admits that Stellar Beach ceased operations in or around October 2024 but denies that this was due to misconduct. Operations ceased as a result of the license turnover, staff departures, and financial disruption caused by outside parties. Defendant denies  any wrong doing,

---

98.

When Stellar Beach ceased business operations in and around October 2024, the Advance Payments collected by Stellar Beach for future Rentals were not in Stellar Beach's Escrow Account.

ANSWER:

Admit in part and deny in part. Defendant admits that not all Advance Payments remained in escrow at that time due to ongoing reconciliation. Defendant denies any  wrong doing or diversion of funds and reiterates that escrow management was handled by brokers and accounting personnel. Defendant denies  any wrong doing,

---

99.

Upon information and belief, at the time Stellar Beach ceased operations, the Advance Payments for future rentals had been improperly transferred to the Operating Account or to Defendant and were not in the Escrow Account.

**ANSWER:**

Deny. Defendant denies that any funds were improperly transferred or used personally. All transfers between accounts were handled by company personnel under broker oversight. Defendant denies  any wrong doing,

---

100.

Plaintiffs were damaged by Defendants through loss of Rental Proceeds and Advance Payments as follows: [Table of alleged losses omitted for brevity.]

**ANSWER:**

Deny. Defendant denies all allegations of  wrong doing and denies that Plaintiffs were damaged by any act or omission on his part. Defendant further denies the amounts alleged. Any losses resulted from business operational factors, reconciliation timing, and broker-level accounting, not personal conduct by Defendant. Defendant denies  any wrong doing,

101.

The allegations contained in the preceding paragraphs are realleged and reincorporated as if fully set forth herein.

**ANSWER:**

Defendant realleges and incorporates his responses to the preceding paragraphs as if fully set forth herein. Defendant denies  any wrong doing,

---

102.

Through the Agreements and personal statements made by the Defendant, Defendant represented to Plaintiffs that funds relating to the Vacation Homes would be kept and accounted for in accordance with the Agreement and applicable laws and regulations, including but not limited to the NCVRA.

**ANSWER:**

Deny in part and admit in part. Defendant admits that the Agreements required funds to be kept and accounted for in accordance with the NCVRA and other applicable laws but denies making any personal statements inconsistent with that duty. All communications and representations were made on behalf of Stellar Beach through its licensed Brokers, including the Broker-in-Charge ("BIC") or Qualifying Broker, who held fiduciary duties for escrow compliance. Defendant, not being a BIC or Qualifying Broker, had no fiduciary duties over trust accounts. Defendant denies  any wrong doing,

103.

Specifically, the Defendant represented that the Rental Proceeds, Advance Payments, and unearned management fees would be kept in the Escrow Account.

**ANSWER:**

Admit in part and deny in part. Defendant admits that the Agreements required that funds such as Rental Proceeds, Advance Payments, and unearned management fees be held in escrow under the control of Stellar Beach's licensed Brokers. Defendant denies that he personally made or controlled any such representations. All trust accounts were maintained under the Broker-in-Charge ("BIC") or Qualifying Broker, who held the fiduciary duties for compliance. Defendant denies  any wrong doing,

104.

The Rental Proceeds, Advance Payments, and unearned management fees were not, in fact, kept in the Escrow Account.

**ANSWER:**

Deny. Defendant denies that the Rental Proceeds, Advance Payments, or unearned management fees were not kept in escrow. Funds were deposited into and transferred between escrow and operating accounts as part of normal business reconciliation conducted by the BIC and accounting staff. Defendant had no fiduciary duties or direct control of trust accounts. Defendant denies  any wrong doing,

105.

When Defendant represented to the Plaintiffs that Rental Proceeds, Advance Payments, and unearned management fees would be kept and accounted for in accordance with the Agreement, applicable laws and regulations, and the NCVRA, Defendant had no intention of doing so.

ANSWER:

Deny. Defendant denies making any false or misleading representations and denies lacking intent to comply with the Agreements and the NCVRA. Defendant relied on licensed Brokers, including the BIC, to maintain trust accounts in compliance with applicable rules. Defendant had no fiduciary duties and did not personally manage or direct escrow funds. Defendant denies  any wrong doing,

106.

Specifically, Defendant had no intention of keeping Rental Proceeds, Advance Payments, and unearned management fees in the Escrow Account.

ANSWER:

Deny. Defendant denies this allegation. Funds were maintained and reconciled by the BIC and accounting staff consistent with Real Estate Commission oversight. Defendant had no authority to control or access the escrow account. Defendant denies  any wrong doing,

107.

Through the Agreements and personal statements made by the Defendant, Defendant induced the Plaintiffs to entrust him with the management of their respective properties and the management of the Rental Proceeds, Advance Payments, and unearned management fees, by representing that the Escrow Account would safeguard the Rental Proceeds that the Plaintiffs were entitled to pursuant to the Agreements.

**ANSWER:**

Deny. Defendant denies inducing Plaintiffs through any personal statements or false representations. Plaintiffs entered into property management Agreements with Stellar Beach, a licensed real estate firm, which was represented by its BIC and Qualifying Broker. Defendant did not have fiduciary responsibility for safeguarding escrow funds. Defendant denies  any wrong doing,

---

108.

Defendant knew, when representing that the Escrow Account would safeguard the Rental Proceeds the Plaintiffs were entitled to under the Agreements, that he would not be using the Escrow Account to do so.

**ANSWER:**

Deny. Defendant denies making or knowing any false representation. Defendant reasonably relied on the BIC and company accounting systems to maintain escrow accounts in compliance with North Carolina law. Defendant denies  any wrong doing,

---

109.

Defendant did not, in fact, use the Escrow Account to safeguard the Rental Proceeds owed to the Plaintiffs.

**ANSWER:**

Deny. Defendant denies this allegation. Escrow accounts were maintained and monitored by licensed Brokers and accounting staff. Defendant had no fiduciary authority. Defendant denies  any wrong doing,

---

110.

Defendant did in fact routinely use funds that were in the Escrow Account to enrich himself

and fund other business endeavors, rather than safeguarding those proceeds on behalf of the Plaintiffs.

ANSWER:

Deny. Defendant denies personally using any escrow funds for enrichment or unrelated business purposes. All transfers or reconciliations were handled by company personnel under broker supervision and regulatory oversight. Defendant denies any wrong doing,

---

111.

The representations through the Agreements and personal statements made to the Plaintiffs by the Defendant were designed and intended to deceive the Plaintiffs.

ANSWER:

Deny. Defendant denies making any false or deceptive statements. All representations were made through standard management contracts administered by Stellar Beach's Brokers. Defendant did not act with intent to deceive. Defendant denies any wrong doing,

---

112.

The Plaintiffs relied on the representations made by Defendant through the Agreements and Defendant's personal statements when choosing to enter in the Agreements with Stellar Beach.

ANSWER:

Deny. Defendant denies that Plaintiffs relied on any personal statements by him. Plaintiffs entered contracts with Stellar Beach, represented by its BIC and Qualifying Broker, who had the fiduciary and statutory obligations for compliance under North Carolina law. Defendant denies any wrong doing,

---

113.

As a proximate result of Defendant's representations through the Agreements and his own personal statements, the Plaintiffs sustained monetary damages when the Escrow Account Shortfall disallowed disbursements of Rental Proceeds and Final Payments to the Plaintiffs.

ANSWER:

Deny. Defendant denies that any representations or actions by him personally caused monetary damages. Any shortfall was due to business-level reconciliation and operational timing, not personal conduct. Defendant held no fiduciary Duty over Plantiffs . Defendant denies  any wrong doing,

114.

Defendant intentionally and willfully misrepresented the use of the Escrow Account pursuant to the Agreement in order to fraudulently obtain funds belonging to the Plaintiffs.

ANSWER:

Deny. Defendant denies intentionally or willfully misrepresenting any matter regarding escrow funds. All financial operations were conducted by Stellar Beach's brokers and accounting personnel in compliance with industry standards and oversight. Defendant denies  any wrong doing,

115.

Defendant in fact obtained money as a result of his misrepresentations to the Plaintiffs.

ANSWER:

Deny. Defendant denies obtaining any funds through misrepresentation. Defendant denies any wrong doing,

116.

Defendant intentionally and willfully diverted the Rental Proceeds and Advanced Payments

to himself and to entities wholly or partially owned by Defendant in order to defraud the Plaintiffs.

**ANSWER:**

Deny. Defendant denies diverting any funds or acting to defraud Plaintiffs. Defendant denies  any wrong doing,

---

117.

Defendant attempted to cover up his intentional and willful diversion of the Rental Proceeds to himself and entities wholly or partially owned by Defendant by soliciting the sale of Stellar Beach to Koberna and others.

**ANSWER:**

Deny. Defendant denies attempting to cover up any conduct. The discussions with Koberna and others about a sale were legitimate business efforts to bring in investors and maintain company operations, not conceal  wrong doing. Defendant denies  any wrong doing,

---

118.

Plaintiffs were harmed by the Defendant's false pretenses and false representations.

**ANSWER:**

Deny. Defendant denies that Plaintiffs were harmed by any false pretenses or representations. Defendant made no false statements and had no fiduciary duties. Any financial disruptions were related to operational issues handled by Stellar Beach's licensed Brokers.

**COUNT II – NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(2)(A)**

*(Actual Fraud)*

119.

The allegations contained in the preceding paragraphs are realleged and reincorporated as

if fully set forth herein.

ANSWER:

Defendant realleges and incorporates his responses to the preceding paragraphs as if fully set forth herein.

---

120.

Upon the execution of each Agreement, Defendant represented to the Plaintiffs that Rental Proceeds, Advance Payments, and unearned management fees would be kept and accounted for in accordance with the Agreement in order to execute a fraudulent scheme.

ANSWER:

Deny. Defendant denies making any misrepresentation or participating in a fraudulent scheme. Defendant was not the Broker-in-Charge ("BIC") or Qualifying Broker and had no fiduciary duties or authority over trust accounts. Any representations made through the Agreements were issued by Stellar Beach and its licensed brokers in compliance with North Carolina law.

---

121.

Each time Defendant diverted funds from the Escrow Account to either the Operating Account or himself, he intended to do so for the purposes of executing his fraudulent scheme.

ANSWER:

Deny. Defendant denies diverting any funds or acting with fraudulent intent. All company transfers were made by accounting personnel and supervised by the BIC in the normal course of business. Defendant denies  any wrong doing,

---

122.

At the execution of each Agreement and at all times thereafter, Defendant intended to deceive Plaintiffs in order to defraud them.

ANSWER:

Deny. Defendant denies any intent to deceive or defraud. Plaintiffs entered into Agreements with Stellar Beach as a licensed firm represented by brokers who held fiduciary duties, not Defendant individually. Defendant denies  any wrong doing,

---

123.

Defendant knew that his personal representations and representations made in the Agreement that Rental Proceeds and Advanced Payments would be safeguarded in the Escrow Account would induce the Homeowners to enter into the Agreements with Stellar Beach.

ANSWER:

Deny. Defendant denies making personal representations or knowingly inducing Plaintiffs. All contracts and communications were executed through Stellar Beach by licensed brokers who were responsible for escrow compliance. Defendant denies  any wrong doing,

---

124.

Defendant knew that his diverting the Rental Proceeds and Advanced Payments to himself would harm the Homeowners and did so for that purpose.

ANSWER:

Deny. Defendant denies diverting any funds or acting to harm Plaintiffs.  Defendant denies  any wrong doing,

---

125.

Plaintiffs were harmed by the Defendant's fraud.

**ANSWER:**

Deny. Defendant denies committing fraud or causing Plaintiffs' alleged harm. Defendant denies  any wrong doing,

---

**COUNT III – NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(4)**

*(Fraud or Defalcation While Acting in a Fiduciary Capacity)*

126.

A fiduciary relationship existed between each of the Plaintiffs and the Defendant.

**ANSWER:**

Deny. Defendant denies any fiduciary relationship existed. Defendant was not a licensed Broker or Broker-in-Charge and therefore had no fiduciary capacity toward Plaintiffs. Fiduciary obligations rested solely with Stellar Beach's licensed brokers. Defendant denies  any wrong doing,

---

127.

The Agreement and NCVRA imposed fiduciary duties on Stellar Beach and Defendant with regard to the Homeowners, including inter alia, the duty to hold all Rental Proceeds and Advanced Payments in trust pursuant to the NCVRA.

**ANSWER:**

Admit in part and deny in part. Defendant admits that the NCVRA and the Agreements required funds to be held in trust under a licensed broker. Defendant denies that he personally held such duties. The BIC or Qualifying Broker maintained responsibility for escrow compliance. Defendant denies  any wrong doing,

128.

The Agreements identified the property to be kept in trust by Stellar Beach and Defendant.

ANSWER:

Deny. Defendant denies  any wrong doing,

---

129.

The Agreements were entered into and the fiduciary duties owed by Stellar Beach and Defendant were established before Stellar Beach or Defendant misappropriated any funds belonging to the Plaintiffs.

ANSWER:

Deny. Defendant denies that he owed or breached any fiduciary duties or misappropriated funds. Defendant denies  any wrong doing,

---

130.

Defendant was entrusted with the Rental Proceeds, Final Payments, and unearned management fees pursuant to the Agreement.

ANSWER:

Deny. Defendant denies being personally entrusted with such funds. Any entrusted funds were managed by Stellar Beach's accounting personnel and licensed BIC.

---

131.

Defendant intentionally failed to account for or safeguard the Rental Proceeds.

ANSWER:

Deny. Defendant denies intentionally failing to account for or safeguard funds. All accounting and trust activity were managed by brokers and staff under established company procedures.

132.

Defendant failed to hold Rental Proceeds, Advanced Payments, Final Payments, and unearned management fees in the Escrow Account in accordance with the Agreement and the NCVRA.

ANSWER:

Deny. Defendant denies failing to hold funds in escrow as required. Defendant had no fiduciary or operational control of the escrow account. Funds were managed by the BIC in compliance with law. Defendant denies  any wrong doing,

133.

Defendant failed and refused to pay the Rental Proceeds owed to each of the Plaintiffs when they became due.

ANSWER:

Deny. Defendant denies failing or refusing to pay rental proceeds. Any delays or discrepancies arose from company-level reconciliation handled by the brokers, not Defendant personally. Defendant denies  any wrong doing,

134.

Defendant consciously disregarded and was willfully blind to a substantial and unjustifiable risk that the Accounting Practices were actively and continuously causing Defendant to breach his fiduciary duties to the Plaintiffs.

ANSWER:

Deny. Defendant denies any conscious disregard or willful blindness. Defendant had no fiduciary duties to breach and relied on Stellar Beach's brokers and accounting systems for compliance.

135.

Plaintiffs were harmed by Defendant's fraud or defalcation while acting as a fiduciary of
the Plaintiffs.

ANSWER:

Deny. Defendant denies acting as a fiduciary or engaging in fraud or defalcation. Any
alleged harm did not result from Defendant's personal conduct.

COUNT IV – NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(4)

*(Embezzlement)*

136.

Pursuant to the Agreements, Plaintiffs entrusted to Defendant, as the president and
manager of Stellar Beach, the Rental Proceeds and Final Payments belonging to
Plaintiffs from the rental of the Vacation Homes.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary
duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs.
No wrongful intent.

137.

Defendant appropriated the Rental Proceeds and Final Payments by transferring the
Rental Proceeds and Final Payments from the Escrow Account to the Operating
Account and then out of the Operating Account to himself or to entities owned or
controlled by him for his personal benefit without disclosing such transfers to the
Plaintiffs and without Plaintiffs' consent, agreement, permission or authorization.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary
duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs.
No wrongful intent.

138.

Defendant's transfer of the Rental Proceeds and Final Payments from the Escrow Account to the Operating Account and then to himself or entities wholly or partially owned by him was neither known, approved nor authorized by the Homeowners.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

139.

Defendant's appropriation of the Rental Proceeds and Final Payments was for Defendant's own benefit by fraudulent intent or deceit.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

140.

Defendant attempted to cover up the transfers by depositing funds into the Escrow Account to cover the Escrow Account Shortfall and by attempting to sell Stellar Beach to Koberna for an amount sufficient to cover the August payments to the homeowners, to pay the property taxes and to cover the Advance Payments for October 2024 and beyond.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

141.

Defendant knew that his appropriation of the Rental Proceeds and Final Payments to himself or entities wholly or partially owned by him was improper as evidenced by his efforts to cover the Escrow Account Shortfall.

**ANSWER:** Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

142.

When Defendant appropriated the Rental Proceeds and Final Payments to himself or entities wholly or partially owned by him, they were deposited into accounts only accessible to him.

**ANSWER:** Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

143.

Defendant's disbursal or use of the Rental Proceeds and Final Payments was done without explanation of reason or purpose.

**ANSWER:** Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

144.

Plaintiffs were harmed by Defendant's misappropriation of the Rental Proceeds and Final Payments.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.


## COUNT V – NONDISCHARGEABILITY PURSUANT TO 11 U.S.C. § 523(a)(6)

*(Willful and Malicious Injury to Plaintiffs and Plaintiffs' Property)*

145.

Defendant transferred assets of Stellar Beach to himself, the Operating Account and other entities wholly or partially owned by him without the Homeowners' knowledge or consent in order to purposefully delay or defeat the Plaintiffs from collecting the Rental Proceeds owed to them.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

146.

Defendant transferred Rental Proceeds to himself, the Operating Account, and other entities wholly or partially owned by him with the intent of using them for his personal expenses, expenses of Stellar Beach, and expenses for other entities wholly or partially owned by him, in violation of the Agreements and the NCVRA.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

147.

Defendant knew, when he transferred Rental Proceeds to himself, the Operating Account, and other entities wholly or partially owned by him, that the Plaintiffs were entitled to those Rental Proceeds.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

148.

Defendant knew that there was no way to pay the Plaintiffs the Rental Proceeds and Advance Payments when they became due as a result of the funds in the Escrow Account being transferred to the Defendant, the Operating Account, and other entities wholly or partially owned by Defendant.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

149.

Defendant knew, when he transferred Rental Proceeds to himself, the Operating Account and other entities wholly or partially owned by him, that the Plaintiffs would be injured by Defendant doing so.

ANSWER:  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

150.

The Plaintiffs were, in fact, injured by the Defendant transferring Rental Proceeds to

himself, the Operating Account and other entities wholly or partially owned by him.

**ANSWER:**  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

151.

Defendant willfully and maliciously injured the Plaintiffs by intentionally diverting the Rental Proceeds to himself and entities wholly or partially owned by Defendant in order to harm the Plaintiffs.

**ANSWER:**  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

152.

Defendant's failure to secure the Rental Proceeds in the Escrow Account was without just cause or excuse.

**ANSWER:**  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

153.

Defendant's transferring of the Rental Proceeds to himself, the Operating Account and other entities wholly or partially owned by him was done intentionally and with the express purpose of and/or knowledge that doing so would result in harm to the Plaintiffs.

**ANSWER:**  Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary

duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

154.

Plaintiffs were harmed by Defendant's willful and malicious injury to Plaintiffs and property belonging to Plaintiffs.

**ANSWER:** Deny. Broker-in-Charge ("BIC") and Qualifying Broker held fiduciary duties for trust-account compliance. Defendant held no fiduciary duties to Plaintiffs. No wrongful intent.

---

**THESE ANSWERING DEFENDANTS HEREBY DENY ANY AND ALL ALLEGATIONS OF THE COMPLAINT NOT SPECIFICALLY ADMITTED HEREIN.**

## SECOND DEFENSE
## PROXIMATE CAUSE

As a further answer and defense to the plaintiff's right to recover, the undersigned defendants do hereby allege and say that should it be adjudicated at the trial of this case that the undersigned defendants were responsible as alleged in the plaintiff's Complaint, which is again specifically denied, then, in that event, the undersigned defendants allege and say that any such actions were not a proximate cause of the plaintiff's damages, if any, and this lack of proximate cause is hereby plead in bar of the plaintiff's right to recover from the undersigned defendants.

## THIRD DEFENSE
## FAILURE TO MITIGATE

As a further answer and defense to the plaintiff's right to recover, the undersigned defendants do hereby allege and say that should it be adjudicated at the trial of this case that the undersigned defendants were responsible as alleged in the plaintiff's Complaint and that such actions were a

proximate cause of the damages alleged in the plaintiff's Complaint, which is again specifically denied, then, in that event, the undersigned defendants allege and say that the plaintiff's actual damages, if any, should be reduced as a result of the plaintiff's failure to exercise that degree of care which a reasonably prudent person would use under the same or similar circumstances to avoid and/or minimize their damages. This failure to mitigate is hereby pled in bar of the plaintiff's right to recover from the undersigned defendants.

## FOURTH DEFENSE
## BREACH OF CONTRACT

As a further answer and defense to the plaintiff's right to recover, these answering defendants allege and say that the claim for relief filed by the plaintiff should be barred by the plaintiff's breach of their contract with Stellar Beach Realty & Rentals, LLC.

## FIFTH DEFENSE
## EQUITABLE DEFENSES

As a further answer and defense to the plaintiff's right to recover, and without waiving any of the foregoing defenses, the undersigned defendants do hereby allege and say that the plaintiff's claims should be barred by the equitable defenses of unclean hands, unjust enrichment, and any other equitable defenses or doctrines that may be developed during discovery.

## RESERVATION OF RIGHT TO ASSERT FUTURE DEFENSES

As a further response to the allegations contained in the plaintiff's Complaint, the undersigned defendants hereby reserve the right to amend this Answer to assert any other appropriate defenses if such defenses are supported by the facts and evidence that are determined after the undersigned defendants conduct further investigation and discovery and have had an opportunity to depose the plaintiff and other witnesses, and the undersigned defendants hereby put

the plaintiff on notice that if such defenses are supported by the facts, the undersigned defendants will amend this Answer at such appropriate time.

WHEREFORE, the defendants pray the Court as follows:

1.    That the plaintiff have and recover nothing of the undersigned defendants;

2.    That the plaintiff's cause of action be dismissed with prejudice;

3.    That a trial by jury be had on all issues of fact arising in this case;

4.    That the undersigned defendants be awarded reasonable attorney's fees;

5.    That the costs of this action be taxed against the plaintiff; and,

6.     For such other and further relief as the Court may deem just and proper.

THIS the ___4__ day of November, 2025.

_

John Adam Kozak

_____

YOUR NAME HERE

CERTIFICATE OF SERVICE I, John Kozak state that on this day, I served copies of the foregoing Motion on the following parties, by placing a letter in the U.S. Mail, first class, postage pre-paid addressed as follows: James S. Livermon, III Womble Bond Dickinson (US) LLP 555 Fayetteville St, Ste 1100 Raleigh, NC 27601 I certify under penalty of perjury that the foregoing is true and correct. This __4th___ day of November 2025.

John Adam Kozak